IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>v. )<br>)<br>**JEREMY WYETH SCHULMAN** )<br>)<br>)<br>**Defendant.** )<br>) | **Crim. No. PX-20-0434** |

# THE UNITED STATES' TRIAL BRIEF

The United States, by and through its undersigned counsel, respectfully submits this trial brief for purposes of summarizing certain legal and factual issues it believes will be relevant to the upcoming trial, which is set to begin on April 29, 2024.

## I. FACTS, WITNESSES, AND CHARGES TO BE PRESENTED AT TRIAL

### a. Factual Overview

The Government will seek to prove at trial that from approximately July 2009 through July 2014, Schulman engaged in the following fraud scheme:

> Schulman, [Abdiaziz] Amalo and others attempted to and did fraudulently obtain control over money and gold that was the property of the Central Bank of Somalia . . . Beginning in July 2009, Schulman, Amalo and others engaged in a scheme to defraud, which scheme and artifice would affect at least one financial institution, namely [Citibank N.A.], in which they attempted to unfreeze the accounts and take control of the accounts based on fraudulent, material misrepresentations about their authority to act on behalf of the Somali government.

ECF 1 ("Indictment" or "Ind.") ¶ 21.

The Government will further seek to prove that, to carry out the fraud scheme:

> Schulman and Amalo created a series of forgeries and other false documents. Schulman presented these and other documents to at least one

1

> financial institution, namely [Citibank], and other banks and entities in the United States and elsewhere, and Schulman falsely claimed that these and other documents authorized him to obtain control of the Somali assets.[1]

*Id.* ¶ 22. Schulman used at least six forged or fraudulent documents in furtherance of the scheme, which are described in the indictment as the "2009 Forged TFG PM Letter," the "2009 Fraudulent Decree Translation," the "August 2010 Forged AG Letter," the "September 2010 Forged AG Letter," the "2013 Forged PM Letter," and the "2013 Forged POA."

In or about June 2009, Schulman, a shareholder at the law firm Shulman Rogers, was contacted by Abdiaziz Amalo, a Somali expatriate and U.S. citizen residing in Maryland. Schulman learned that Amalo's uncle, a former Governor of the Central Bank of Somalia named Ali Abdi Amalow ("Former Governor Amalow"), had information regarding the location of Somali sovereign assets that had been frozen since the onset of the Somali Civil War (the "Frozen Somali Assets"). Schulman also learned that Former Governor Amalow was no longer the Governor of the Central Bank of Somalia and did not hold any position in the Transitional Federal Government of Somalia. Nevertheless, Amalo—using text provided by Schulman—created a forged document purporting to show that the Prime Minister of the Transitional Federal Government of Somalia had "re-affirmed" that Former Governor Amalow was the Governor of the Central Bank. Schulman, knowing that Amalow was not the Central Bank Governor, fraudulently asserted exactly that to various entities holding Frozen Somali Assets.

In December 2009, Former Governor Amalow was appointed an "Advisor" by Presidential Decree No. 214 in December 2009. Schulman tried to get the Somali President to sign a different document granting Former Governor Amalow "full authority to direct and control the assets of the Central Bank of Somalia" but was unable to do so. Instead, Schulman fraudulently inflated Former

---

[1] The Frozen Somali Assets obtained by Schulman included assets held by Citibank N.A., which was a federally insured financial institution as that term is used in the bank fraud statute, 18 U.S.C. § 1344.

2

Governor Amalow's authority by inserting a clause into an English-language translation of the decree that falsely described Former Governor Amalow as the "Director with the responsibility and authority to recover the national assets of the country." Schulman provided this false translation (the "2009 Fraudulent Decree Translation") to entities holding Frozen Somali Assets, including a UK-based currency printer named De La Rue, Citi Private Bank (Switzerland) ("Citi Switzerland"), the Office of the Comptroller of the State of New York (the "NY Comptroller"), Banco Intesa, and New York-headquartered Citibank N.A. ("Citibank"). Schulman continued to assert authority over the Frozen Somali Assets based on the 2009 Fraudulent Decree Translation even after its legitimacy was questioned by an attorney for De La Rue and in a letter from the Central Bank of Somalia.

Beginning in or about August 2010, Amalo, in coordination with Schulman, created the August 2010 Forged AG Letter and the September 2010 Forged AG Letter, in an attempt to satisfy a request of Banco Intesa, an Italian bank that held Frozen Somali Assets. Schulman rejected as unsatisfactory multiple versions of draft letters provided by Amalo (which contained indicia that they were forgeries) before accepting a version of the forgery and providing it to Banco Intesa.

Similarly, in or about April 2013, Amalo created two additional forgeries, the 2013 Forged PM Letter and the 2013 Forged POA, which purported to establish that a Somali associate of Amalo's was the new "Director of Financial Asset Recovery." Schulman, knowing that these documents were forgeries, provided them to Citibank and the NY Comptroller and requested access to the Frozen Somali Assets under these entities' control.

Ultimately, three entities released Frozen Somali Assets to Shulman Rogers's control at Schulman's request, as follows:

- Citi Switzerland released approximately $36,000 in July 2010.

- Citibank released approximately $7.4 million in September 2013 and October 2013, and another approximately $300,000 in July 2014.
- The NY Comptroller released approximately $4.8 million in November 2013.

The Government will undertake to prove that the forged and fraudulent documents provided by Schulman were material to the entities that released these funds.

In addition, in 2013 the NY Comptroller and Citibank requested the Schulman provide a document known as a "25B Certification" related to Somalia before they would release Frozen Somali Assets under their control. In or about September 2013, the U.S. Department of State ("State Department") issued a 25B Certification establishing that the President of Somalia was "the sole representative of Somalia with full authority to receive, control, and dispose of" the property "received by any Federal Reserve Bank or any insured bank, from or for the account of the Central Bank of Somalia." Schulman provided the 25B Certification to Citibank and the NY Comptroller. He asserted that he could exercise control over the Frozen Somali Assets on the basis of the 25B Certification and a power of attorney letter from the Somali President. Lawyers for the State Department and the Federal Reserve Bank of New York advised Schulman, however, that the 25B Certification did not permit the Somali President to delegate his authority to any third person. Nevertheless, Schulman continued to assert that he could exercise delegated authority under the 25B Certification, and he concealed from the NY Comptroller and Citibank that he had been told otherwise by the State Department and the Federal Reserve Bank of New York.

Schulman's claim of authority under the 25B Certification was material to Citibank and the NY Comptroller's decisions to release the Frozen Somali Assets to Schulman's control. The evidence will show, however, that these entities also relied on the forged and fraudulent documents that Schulman had previously furnished before the issuance of the 25B Certification.

After Schulman obtained control of approximately $12.2 million of Frozen Somali Assets in approximately September through November 2013, he caused Shulman Rogers to transfer approximately $9 million to the Somali Government, while retaining approximately $3.3 million to pay other third parties and to keep for its own compensation. Schulman used fraudulent means to ensure that his co-conspirators would profit from the scheme. Among other things, in order to facilitate payment to Amalo and a third individual (Co-Conspirator 1), Schulman and Amalo worked together to create a fraudulent invoice from Haden Global Services LLC, a Maryland corporation controlled by Amalo. Schulman, knowing that the invoice contained false entries and concealed Amalo's role in creating forged and fraudulent documents, caused it to be sent to his law firm's finance personnel. On or about March 31, 2014, the law firm sent Haden Global Services $673,784, which Amalo shared with Co-Conspirator 1 through four international wire transfers in or about April 2014. The evidence will show that Schulman, through his compensation from Shulman Rogers, also profited significantly from having obtained control of the Frozen Somali Assets.

### b.  The Government's Witnesses

The Government expects to call up to 18 witnesses to testify at trial during its case-in-chief, exclusive of witnesses who would testify solely to the authenticity of records and their status as business records. Set forth below are high-level summaries of each witness's anticipated testimony; these summaries are not intended to cover all the facts to which each witness is expected

to testify, and the order of witnesses presented below is not intended to reflect the order the witnesses will testify at trial.[2]

**Mx. Mozella Brown** is a State Department intelligence analyst for the Department's Bureau of Intelligence and Research with experience as a researcher on Somalia. The Government will call Mx. Brown to testify as an expert witness about relevant aspects of Somalia's government and recent history. This testimony will place the alleged criminal conduct in context by, among other things, describing the factors that caused the Frozen Somali Assets to be frozen and the structure of the Somali Government during the period of the charged conspiracy.[3] The Government anticipates that Mx. Brown's testimony will primarily consist of describing facts based on their specialized knowledge rather than offering opinions. *See* Fed. R. Evid. 702 (providing that an expert may testify "in the form of an opinion or otherwise").

**Abdiaziz Amalo** pleaded guilty to engaging in a wire fraud scheme with Schulman related to the Somali asset recovery. He also pleaded guilty to separate stand-alone offenses unrelated to Schulman. He is expected to testify to his role in, and knowledge of, the charged conspiracy, including, among other things, his creation of forged and fraudulent documents, his communications with Schulman, his receipt of money from Schulman, and his distribution of a portion of the criminal proceeds to Co-conspirator 1.

---

[2] The Government reserves the right to amend its witness list based on developments at trial. The Government provided Schulman with its preliminary witness list on April 8, 2024, as required by the Sixth Amended Pre-Trial Scheduling Order. The Government had previously produced the Jencks information related to these witnesses, as well as all interview memoranda related to these witnesses. The Government is assessing whether it possesses any additional information that arguably consists of Jencks information for any of these witnesses and, if it identifies any, it will produce it promptly.

[3] Pursuant to Federal Rule of Criminal Procedure 16, the Government provided notice of Mx. Brown's anticipated testimony on August 4, 2023, and the Government supplemented its disclosure on March 22, 2024, and April 9, 2024.

Amalo's testimony will also include testimony about certain out-of-court statements that he made, and that he observed others make, to Schulman. These statements will be admissible because, among other things, they are probative of Schulman's knowledge. For example, Amalo's testimony that he observed Schulman being told by Former Governor Amalow in 2009 that Former Governor Amalow at that time was not the Central Bank Governor of Somalia falls outside of the hearsay rule because it is offered not for the truth of the matter asserted but for the effect on the listener. As the Fourth Circuit recently explained:

> Hearsay is an out-of-court statement offered "*to prove the truth of the matter asserted in the statement*." Fed. R. Evid. 801(c)(2) (emphasis added). If a statement is offered for any other reason, it is not hearsay and may not be excluded on that basis. *See* Fed. R. Evid. 802 (providing hearsay is generally not admissible but establishing no broad rule against out-of-court statements). A classic example are statements offered for their effect on the listener. *See United States v. Simmons*, 11 F.4th 239, 263–64 (4th Cir. 2021). Such statements are not hearsay because their relevance does not depend on whether the declarant spoke the truth. Instead, they are admissible because they are offered to "establish the state of mind thereby induced" in the recipient or "to show the information which [the recipient] had as bearing on the reasonableness [or] good faith ... of subsequent conduct." 2 McCormick on Evid. § 249 (8th ed.) (McCormick).

*United States v. Gallagher*, 90 F.4th 182, 195 (4th Cir. 2024); *see also United States v. Moralez*, No. 21-4268, 2023 WL 2888558, at *1 (4th Cir. Apr. 11, 2023) (unpublished) ("Statements that are offered to prove the effect of the statement on the listener, however, are not offered for their truth and thus do not fall within the definition of hearsay."); *United States v. Guerrero-Damian*, 241 F. App'x 171, 173 (4th Cir. 2007) (unpublished) (in prosecution for transporting illegal aliens, upholding district court's admission of witness's testimony that the witness had heard another individual tell the defendant that he had entered the United States illegally because "[a] statement is not hearsay if it is offered to prove knowledge, or show the effect on the listener or listener's state of mind.").

**Douglas Denham** (De La Rue), **Florence Parker** (Citi Switzerland), **Rebecca Nelson** (Citibank), and **Wendy Reeder** (NY Comptroller) are expected to testify to their interactions with Schulman in connection with his efforts to obtain assets or otherwise assert claims on behalf of Somalia. Many of these interactions occurred through emails and letters, which these witnesses will introduce into evidence. These witnesses will also testify to their decision-making related to Schulman's claims and the relevance of certain assertions made by, and documents provided by, Schulman.

Mr. Denham and Ms. Parker were deposed in videotaped depositions pursuant to Federal Rule of Criminal Procedure 15. The Government's motion to admit portions of their video testimony at trial pursuant to Federal Rule of Evidence 804(b)(1) is pending. ECF 359.

**Mark Sivills** is a former associate of Amalo and a notary public. His notary stamp appears on some of the alleged forged and fraudulent documents used by Schulman. Relevant emails purportedly sent by Mr. Sivills also will be introduced into evidence through Amalo. Sivills is expected to testify regarding whether he notarized the relevant documents and sent the relevant emails.

**Farah Abdi**, a brother of Amalo, is expected to testify regarding translations he performed of the 2009 Presidential Decree and his certification of the 2009 Fraudulent Decree Translation.[4]

**Elmi Duale**, a native Somali speaker, is a court-certified interpreter in six states, and he has provided interpretation and translation services in state and federal courts since 2004. He is also the author of an English-Somali legal dictionary. He is expected to testify as an expert witness to the correct translation of the 2009 Presidential Decree appointing Former Governor Amalow to

---

[4] Farah Abdi is a U.S. citizen who has been overseas for the past few months. As the Government has informed defense counsel, the Government is coordinating with Farah Abdi to facilitate his availability to testify at trial.

an advisor position, and to the correct translation of a 2010 Presidential Decree that removed Former Governor Amalow from that position. He will also compare the correct translation of the 2009 Presidential Decree to other translations in evidence in the case, including the 2009 Fraudulent Decree Translation.[5]

**Brett Phillips**, an attorney at the Federal Reserve Bank of New York, and **Gabriel Swiney**, a former attorney at the State Department, were both involved in the 25B Certification related to Somalia that was issued in 2013, and they are expected to testify accordingly. They will describe decisions made related to the 25B Certification and communications that each of them had with Schulman. Mr. Phillips, based on his first-hand knowledge of 25B Certifications from his experience working on other 25B Certifications before the Somalia 25B Certification, will also explain to the jury what a 25B Certification is, and how the 25B Certification issued for Somalia differed from at least one previous 25B Certification in which he was involved.

**Michael Nolan,** a former partner at a law firm engaged by Shulman Rogers in 2013 to provide advice in connection with potential payments to Amalo and Co-conspirator 1, is expected to testify regarding the advice that he provided.[6] He is also expected to testify about communications he had with Schulman in connection with that advice.[7]

**Larry Beabes** is a former Chief Financial Officer of Shulman Rogers. He is expected to testify about relevant financial transactions reflected in Shulman Rogers' bank statements, including wire transfers of Frozen Somali Assets received by Shulman Rogers, the payment to

---

[5] Pursuant to Federal Rule of Criminal Procedure 16, the Government provided notice of Mr. Abdi's anticipated expert testimony on August 30, 2023, and the Government supplemented its disclosure on March 22, 2024. The Government provided Mr. Abdi's certified translations of the two Presidential decrees with these disclosures.

[6] The Court previously held that the crime-fraud exception vitiated any potentially applicable attorney-client privilege with respect to this advice.

[7] The postponement of the trial from March 4, 2024 to April 29, 2024 conflicted with a previously agreed commitment of Mr. Nolan, which will likely impact the Government's decision to call him to testify at trial.

Haden Global Services made by Shulman Rogers charged in Count Four, and other payments made for the benefit of Amalo. He may also testify about the Noticed 404(b) Evidence at issue in Schulman's motion to exclude. ECF 402, 413.

**David Pordy** was the Managing Shareholder of Shulman Rogers during a portion of the relevant period. He is expected to testify about an engagement letter purportedly executed by Schulman and Former Governor Amalow and about statements filed with the U.S. Department of Justice by Shulman Rogers (that were signed by Pordy) related to Somalia.

**Samuel Spiritos** has been the Managing Shareholder of Shulman Rogers since approximately 2013. He is expected to testify about Schulman's compensation during the relevant period and its relation to money brought into the firm by Schulman through the Frozen Somali Assets.

**Robert Baumgarten** is the Chief Operating Officer of Shulman Rogers. The Government has proposed stipulations to defense counsel that would obviate its need to call him to testify at trial. If he were to testify, he would testify regarding the authenticity of documents produced by Shulman Rogers, the electronic process or system at Shulman Rogers by which Shulman Rogers

produced historical compensation information for Schulman, and the fact that a certain email address at Shulman Rogers corresponds to a scanner device.

**Yussur Abrar** is a former Central Bank Governor of Somalia. She is expected to testify about her actions related to Shulman Rogers and her interactions with Schulman and Co-conspirator 1.[8]

**FBI Special Agent Benjamin Johnson** is expected to testify at trial regarding certain written statements made by Schulman, as well as evidence reflected in relevant toll records, subscriber records, travel records, and other business records. He will also testify regarding the chronology of various events. His testimony is further discussed *infra*.[9]

### c. The Charges

The Government will set out to prove the following charges:

| COUNT | CHARGE |
|---|---|
| 1 | Conspiracy to Commit Mail, Wire, and Bank Fraud (18 U.S.C. § 1349) |
| 2 | Wire Fraud (January 24, 2013 email to the NY Comptroller enclosing the 2009 Fraudulent Decree Translation) (18 U.S.C. §§ 1343, 2) |
| 3 | Wire Fraud (April 19, 2013 email to Citibank enclosing the 2013 Forged PM Letter and the 2013 Forged POA) (18 U.S.C. §§ 1343, 2) |
| 4 | Wire Fraud (March 31, 2014 wire transfer from Shulman Rogers to Haden Global Services in the amount of $673,784) (18 U.S.C. §§ 1343, 2) |
| 5 | Bank Fraud (re: Citibank) (18 U.S.C. § 1344) |

---

[8] In the event that the Government intends to elicit statements made by Co-conspirator 1 to Abrar pursuant to the exception to the hearsay rule for co-conspirator statements made in furtherance of the conspiracy, the Government will raise that issue with the Court in advance of the testimony. This will allow the Court and defense counsel to consider any threshold evidentiary issues before the information is presented to the jury.

[9] Special Agent Johnson is case agent on the case. The Government expects that he will accompany the Government at counsel table during trial.

| COUNT | CHARGE |
|---|---|
| 6 | Mail Fraud (March 19, 2010 letter to Citibank enclosing the 2009 Fraudulent Decree Translation) <br> (18 U.S.C. §§ 1341, 2) |
| 7 | Conspiracy to Commit Money Laundering in violation of Section 1957 <br> (18 U.S.C. § 1956(h)) |
| 8 | Money Laundering (April 7, 2014 wire transfer of $85,000 of criminal proceeds from Haden Global Services) <br> (18 U.S.C. § §1957, 2) |
| 9 | Money Laundering (April 7, 2014 wire transfer of $75,000 of criminal proceeds from Haden Global Services) <br> (18 U.S.C. §§ 1957, 2) |
| 10 | Money Laundering (April 14, 2014 wire transfer of $95,000 of criminal proceeds from Haden Global Services) <br> (18 U.S.C. §§ 1957, 2) |
| 11 | Money Laundering (April 14, 2014 wire transfer of $65,000 of criminal proceeds from Haden Global Services) <br> (18 U.S.C. § §1957, 2) |

## II.     ANTICIPATED LEGAL ISSUES THAT MAY ARISE AT TRIAL

The Government hereby identifies various evidentiary and other issues that may arise during trial.

### a. State Department Productions

The Government understands that there will not be any issues at trial related to classified information.

As the Court is aware, during the investigation, the Government obtained documents from the State Department that it produced in discovery. On January 9, 2024—more than three years after he was indicted, and more than 29 months after the Court first set a trial date in this case (ECF 58)—Schulman moved for a trial subpoena to obtain additional records from the State

Department, which the Court promptly granted.[10] ECF 351, 352. The State Department subsequently searched for, identified, and produced responsive documents that had not been previously produced to the Government and shared with Schulman in discovery. The State Department also redacted certain materials, and withheld other materials in their entirety, on the grounds that the redacted and withheld materials were privileged, classified, or both.

On March 29, 2024, the parties jointly moved for a protective order to facilitate the review of the classified materials, which the Court promptly granted. ECF 403, 404. On April 4 and 5, 2024, defense counsel and the Government each reviewed at the State Department all the materials withheld on classification grounds. The Government asked defense counsel to identify any classified materials that it might use at trial. Defense counsel did not identify any. Accordingly, it appears that there will not be any issues at trial related to classified material, and no further procedures are required related to the classified material identified by the State Department.

The Government understands that defense counsel has other issues related to the State Department productions. To the extent that these issues relate to materials withheld by the State Department on the grounds of privilege or attorney work product protection, the Government would have no objection to the Court reviewing them *in camera* for potentially exculpatory information. The Government notes, however, that it has produced seven memoranda of interviews from four State Department officials, and Schulman has also received hundreds of pages of State Department documents that the Government previously obtained (and disclosed). Schulman also has all of his communications with the State Department, which were produced by Schulman

---

[10] Schulman also sought documents and testimony from the State Department through the *Touhy* process beginning in or around December 2020. ECF 292. Schulman, however, never brought an action against the State Department under the Administrative Procedure Act to seek judicial review of the State Department's *Touhy* response. ECF 316.

Rogers. Despite having all this information, Schulman has not identified any basis to believe there is (or ever was) unique exculpatory information at the State Department.

### b. Proposed Stipulations

The parties have agreed to stipulate to certain undisputed facts, including the facts that the wires that undergird the wire fraud charges in Counts Two through Four passed between two or more states; that Citibank N.A. is FDIC-insured, as relevant to the bank fraud charge in Count Five; that the document that undergirds the mail fraud charge in Count Six was sent by a private or commercial interstate carrier; and that the transactions that undergird the money laundering charges in Counts Eight through Eleven affected interstate commerce. The parties are engaged in ongoing discussions regarding other stipulations, including stipulations related to the authenticity of documents, which would avoid the need for the parties to call custodians or records at trial or would otherwise narrow the evidentiary and factual issues in dispute.

The Government intends to introduce stipulations into evidence at trial and to have them read into the record at the time of admission.

### c. Summary Exhibits

The Government intends to introduce two types of summaries of voluminous records pursuant to Federal Rule of Evidence 611: summaries of voluminous bank records showing key payments related to the charged crimes, and summaries of voluminous toll records showing key communications related to the charged crimes.[11] Because the underlying bank records and toll records will already be admitted into evidence, these summaries will be properly admitted into evidence pursuant to Rule 611(a) rather than 1006.[12] *See United States v. Ortiz-Orellana*, 90 F.4th

---

[11] These summary exhibits were provided to defense counsel as part of the Government's production of its preliminary exhibit list, and the accompanying exhibits, on April 8, 2024.

[12] The Government anticipates that both the underlying records and the summaries will be admitted through the testimony of Special Agent Johnson.

689, 699 (4th Cir. 2024) (explaining that "Rule 1006 permits summary charts to be admitted into evidence as a surrogate for underlying voluminous records that would otherwise be admissible into evidence", whereas "Rule 611 permits the admission of summary charts to facilitate the presentation and comprehension of evidence already in the record"). These summaries are consistent with the type of exhibits frequently admitted to summarize voluminous records. *See United States v. Dukes,* 242 F. App'x 37, 49-50 (4th Cir. 2007) (unpublished) (upholding admission of summary of financial transactions in a wire fraud and money laundering prosecution); *United States v. Atchley*, 699 F.2d 1055, 1059 (11th Cir. 1983) (upholding admission of summary chart prepared by law enforcement agent to aid the jury in considering toll records). The Government has produced the underlying bank and toll records in discovery and included these records on its preliminary exhibit list.

The Government also intends to introduce pursuant to Rule 611 a timeline that will set forth a chronological summary of key communications introduced in evidence, as described below.

### d. Special Agent Johnson's Testimony

Special Agent Johnson is expected to testify regarding toll records, public records, bank records, travel records, email account subscriber information, and other business records that are primarily admissible pursuant to Federal Rules of Evidence 803(6), 803(8), 902(11), and 902(13).[13] This testimony will show, among other things, communications involving Schulman and Amalo; financial transactions involving Schulman, Amalo, Shulman Rogers, Co-conspirator 1, and entities associated with those persons; and Amalo's creation of email accounts used in connection with the charged crimes.

---

[13] As set forth above, the Government has proposed stipulations to defense counsel that would obviate the need for additional testimony to authenticate the records or establish the foundation for the applicable hearsay exceptions, none of which the Government believes is reasonably in dispute.

15

Special Agent Johnson will introduce into evidence certain emails and letters written by Schulman as well. These exhibits will primarily be admissible for the truth of the matter asserted pursuant to Federal Rule of Evidence 801(d)(2) (party opponent admissions).

The Government also anticipates that Special Agent Johnson will provide a detailed timeline summary that shows the chronology of certain evidence admitted through him alongside certain evidence admitted into evidence through other witnesses. This chronological summary will aid the jury in evaluating the evidence introduced during a lengthy trial involving complex facts. Specifically, the chronology will be probative of Schulman's *mens rea* because it will show, among other things, the information that Schulman had about various documents and claims of authority *at the specific times* that he made representations about those documents and asserted claims of authority to entities holding Frozen Somali Assets.[14]

The Fourth Circuit has routinely upheld the admission of this type of summary testimony by a law enforcement agent pursuant to Federal Rule of Evidence 611(a).  In *United States v. Johnson*, 54 F.3d 1150, 1157-1160 (4th Cir. 1995), the court considered law enforcement agent testimony that summarized the testimony of other witnesses and included a summary chart of the organization of the alleged drug trafficking enterprise. The court held that "first, we consider whether the summary chart aids the jury in ascertaining the truth." *Id.* at 1159. The court explained that "[i]n making this determination, we look to the length of the trial, the complexity of the case, and the accompanying confusion that a large number of witnesses and exhibits may generate for the jury." *Id.*

---

[14]  The Government is working to complete and provide to defense counsel before trial a draft version of the summary chronology. This will enable defense counsel to raise any objections to its admissibility well in advance of Special Agent Johnson's testimony.

The court further held that second step of the analysis is "applying what is essentially an analysis under Rule 403 of the Federal Rules of Evidence [of] the possible prejudice that would result to the defendant by allowing the summary chart into evidence." *Id.* The court further cited with approval that "a number of courts considering the issue have developed safeguards to minimize possible prejudice to a defendant by (1) ensuring that the individual who prepared the chart—as well as the evidence upon which the preparer relied—was available for cross-examination by the defendant to test the competence of the evidence as presented in the summary chart, and, (2) ensuring that the district court properly instructed the jury concerning the manner in which they were to consider the charts." *Id.* (internal citations omitted).

The court held that the summary testimony and chart satisfied the first prong—helpfulness in assisting the jury to ascertaining the truth—because of the complex nature of the conspiracy and the large number of witnesses presented, which included 30 witnesses who testified over a seven-day period. *Id.* at 1160. Here, the complexity and scope of the Government's trial evidence similarly indicates that the proposed chronological summary would aid the jury: as set forth above, the Government anticipates calling up to 18 witnesses in its case-in-chief, and introducing hundreds of documentary exhibits, to meet its burden to prove a complex scheme involving international finance.

In *Johnson*, the court also concluded that the evidence satisfied the second prong (avoiding improper prejudice) because defendants were provided with an opportunity to review the summary chart before it was admitted; the testifying agent was subject to cross-examination on the chart; and the district court instructed the jury appropriately. *Id.* at 1160. Here too, any concern about prejudice will be addressed by the Government providing defense counsel with an opportunity to review and challenge the summary chronology before it is presented to the jury and by appropriate

limiting instructions to the jury (which the parties have proposed). Moreover, the reliability of the summary chronology will be ensured because Schulman will have an opportunity to cross-examine Special Agent Johnson about it.[15]

Accordingly, the Government submits that this aspect to Special Agent Johnson's testimony should be admitted pursuant to Rule 611(a). *Johnson,* 54 F.2d 1160; *see also United States v. Rollack,* 570 F. App'x 267, 269 (4th Cir. 2014) (unpublished) (affirming district court's admission of law enforcement agent testimony that summarized the contents of seized writings and related them to the contents of other witnesses' trial testimony); *United States v. Mamalis,* 498 F. App'x 240, 249 (4th Cir. 2012) (unpublished) (affirming district court's admission of summary charts introduced by a law enforcement agent "in light of the length, complexity, and nature of the case" where "the trial was seven days long and involved twenty-three witnesses," "the summary charts enabled the jurors to untangle the intricate facts of the case," and the defendant did not suffer any prejudice because he was given access to the charts before trial, he could cross examine the agent who prepared the charts, and the court gave the jury proper instructions).

e.  **Defense Trial Testimony of FBI Agents**

Defense counsel have indicated their intent to call FBI Special Agent Victor Ciapas and retired FBI Special Agent Nanette Schumaker to testify.[16] The potential evidentiary issues related to SA Ciapas's testimony have already been largely addressed by the Court, which ruled that

---

[15]  Moreover, the chronological summary here will be derived from documents and records, and thus, Special Agent Johnson will not implicitly "vouch" for the credibility of any witness testimony. (That is, the summary chronology will not include entries indicating "on date X witness Y told the jury that he had conversation Z with the defendant"). Accordingly, the chronological summary will not include the potential prejudice that was the subject of the appellants' (unsuccessful) challenge to the summary testimony in *Johnson*. *Johnson*, 54 F.3d at 1156.

[16]  The Government accepted service of subpoenas on behalf of SA Ciapas and retired FBI Special Agent Schumaker, who continues to work with the Government.

certain out-of-court statements identified in Schulman's motion that were made to SA Ciapas by Former Governor Amalow and described in an interview memo are admissible. ECF 321. The Court indicated that it would reserve ruling on whether the defense could elicit two particular statements from Former Governor Amalow to SA Ciapas that the Government contends are opinion testimony by a layperson and, thus, would be inadmissible testimony by Former Governor Amalow even if he were testifying in court. *Id.* at 55:03-68:16.

The Court also indicated that pursuant to the rule of completeness, the Government will be able to elicit from SA Ciapas additional statements made by Former Governor Amalow in the same interview. *See* Ex. A, Transcript, 60:21-23 (Jan. 5, 2024) ("the rule of completeness is going to be, what else did Governor Amalow tell Agent Chiapas [sic]").

Regarding retired Agent Schumaker, the Government's pending motion *in limine* respectfully requests that the Court require the defense to make a proffer of relevance and admissibility before her trial testimony because many lines of inquiry that defense counsel might pursue with retired Special Agent Schumaker are squarely inadmissible under the hearsay rule, and other lines of inquiry that defense counsel might pursue with retired Special Agent Schumaker would be irrelevant, unduly prejudicial, and inadmissible, such as questions about the Government's charging decisions, questions about the Government's choices as whom to interview and whom not to interview, etc. ECF 356 at 10-12.

*****

Respectfully submitted,

| | |
|---|---|
| GLENN LEON<br>Chief<br>Fraud Section | EREK L. BARON<br>United States Attorney<br>District of Maryland |
| /s/<br>Jason M. Manning<br>Allison L. McGuire<br>Trial Attorneys | /s/<br>David I. Salem<br>Assistant U.S. Attorney |